FILED

JUL 15 2016

Clerk, U.S. District and
Bankruptcy Courts

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASADULLAH HAROON "AL AFGHANI" GUL, DETAINEE AT GUANTANAMO BAY, CUBA** *Petitioner/Plaintiff*  v.  **BARACK H. OBAMA, PRESIDENT OF THE UNITED STATES**  **ASHTON B. CARTER, SECRETARY OF DEFENSE**  **REAR ADMIRAL PETER J. CLARKE, COMMANDER, JOINT TASK FORCE GUANTANAMO**  *Respondents/Defendants* | **PETITION FOR WRIT OF HABEAS CORPUS** Civ. No.  Case: 1:16-cv-01462 (G Deck) Assigned To : Mehta, Amit P. Assign. Date : 7/15/2016 Description: Habeas Corpus/2241 |

## PETITION FOR WRIT OF HABEAS CORPUS

1.    Petitioner Haroon Gul petitions this Court for a Writ of Habeas Corpus.  Mr. Gul is a citizen of Afghanistan and is being held virtually *incommunicado* in Respondents' unlawful custody.

### I.
### JURISDICTION

2.    Petitioner brings this action under 28 U.S.C. §§ 2241 and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202; as well as the Fifth Amendment to the United States Constitution, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, and customary international law.  Because he also seeks declaratory relief, Petitioner also relies on Federal Rule of Civil Procedure 57.

3.    This Court is empowered under 28 U.S.C. § 2241 to grant the Writ of Habeas Corpus,

RECEIVED

JUL 15 2016

Clerk, U.S. District and
Bankruptcy Courts

and to entertain the Petition filed by Haroon Gul.  This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction.

## II.
## VENUE

4.     Venue is proper in the United States District Court for the District of Columbia, since at least one respondent resides in the district, a substantial part of the events or omissions giving rise to the claim occurred in the district, at least one respondent may be found in the district, and all respondents are either officers or employees of the United States or any agency thereof acting in their official capacities.  28 U.S.C. §§ 1391(b); 1391(e).

## III.
## PARTIES

5.     Petitioner Haroon Gul is a citizen of Afghanistan presently detained in Camp 6, Guantanamo Bay.

6.     Respondent Obama is the President of the United States and Commander in Chief of the United States Armed Forces.  It is pursuant to the Authorization for the Use of Military Force ("AUMF"), or alternatively, under Respondent Obama's authority as Commander in Chief and under the laws and usages of war that Mr. Gul is being detained. Accordingly, Respondent Obama is ultimately responsible for Petitioner's unlawful detention.  He is sued in his official and individual capacities.

7.     Respondent Carter is the Secretary of the United States Department of Defense.  Pursuant to the AUMF or the President's authority as Commander in Chief and under the laws and usages of war, Respondent Carter has been charged with maintaining the custody and control of Petitioner.  He is sued in his official and individual capacities.

2

8. Respondent Clarke is the Commander of Joint Task Force Guantanamo, the task force running the detention operation at Guantanamo. He has supervisory responsibility for Petitioner and is sued in his official and individual capacities.

## IV.
## STATEMENT OF FACTS

9. Petitioner, Haroon Gul, is not, nor has he ever been, an enemy combatant, nor does he pose any threat whatsoever to the security of the United States.

10. Petitioner Haroon Gul is an Afghan citizen in Respondents' unlawful custody. Though Haroon was born in Afghanistan, violence there forced him and his family to leave everything they knew and seek shelter in a refugee camp in Pakistan, where Haroon spent his whole life before Guantanamo. Despite living under the harshest conditions, Haroon was able to educate himself through the college level, as well as provide for his small family. With an economics degree and fluency in four languages (now five), Haroon had just managed to rise above the unfortunate circumstances of his upbringing when he was captured by Afghan forces during a business trip to Afghanistan, at which point he was then transferred into U.S. custody. He was rendered to Guantanamo Bay in 2007, where he has languished ever since.

11. At no time in his life was Haroon a member of the Taliban or al Qaeda; he never caused nor attempted to cause any harm to American personnel or property; he did not commit any violent act against any American person nor espouse any violent beliefs against any American person or property. He had no involvement whatsoever – direct or indirect – in either the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to al Qaeda, the Taliban, or any other terrorist group.

12. Upon being apprehended and taken into U.S. custody, Petitioner promptly identified himself by his correct name and nationality to the United States. He requested that the United States provide him with access to his family and to legal counsel; it did neither.

13. Petitioner has been held under conditions that violate his human and constitutional rights to due process and the attendant right to be free from cruel, unusual and degrading treatment. As with all detainees held at Guantanamo Bay, Haroon has been housed throughout his detention in accommodations that fail to satisfy both domestic and internationally accepted standards of accommodation for any person subject to detention. He has not been provided with the opportunity to exercise his religion. He has been exposed to the indignity and humiliation of twenty-four-hour surveillance, invasive genital searches, and forced nudity.

**Guantanamo Bay Naval Station**

14. On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray, at the United States Naval Base, in Guantánamo Bay, Cuba. In April 2002, all prisoners were transferred to a more permanent prison facility in Guantanamo, Camp Delta. Guantanamo is a self-sufficient and essentially permanent city with approximately 7,000 military and civilian residents under the complete jurisdiction and control of the United States. Guantanamo occupies nearly thirty-one square miles of land, an area larger than Manhattan, and nearly half the size of the District of Columbia. It has its own schools, generates its own power, provides its own internal transportation, and supplies its own water. Offenses committed by both civilians and foreign nationals living on Guantanamo are brought before federal courts on the mainland, where respondents enjoy the full panoply of constitutional rights.

15. The United States has occupied Guantánamo since 1903, and has repeatedly declared its intention to remain there indefinitely. For several decades, the United States has resisted

claims of national sovereignty made by Cuba over Guantánamo, insisting that its occupation of the land is legal and will remain so in perpetuity, so long as the United States chooses to exercise dominion and control over the land.

16. By the terms of its lease agreement with Cuba, the United States exercises "complete jurisdiction and control" over the Naval Base.[1]  The U.S. Supreme Court has recognized the United States' "exclusive and plenary jurisdiction over the U.S. Naval Base at Guantanamo Bay." *Rasul v. Bush*, 542 U.S. 466, 480 (2004).

17. In June 2007, the precise date unknown to counsel but known to Respondents, the United States military transferred Haroon Gul to facilities at Guantanamo.

18. Since taking Petitioner into custody, the U.S. military has held him virtually *incommunicado*. He has been interrogated repeatedly by agents of the U.S. Departments of Defense and Justice, though he has not been charged with an offense, nor has he been notified of any contemplated charges. He did not have an attorney for fully nine years after he was captured and rendered into U.S. custody. He has not been informed of his rights under the United States Constitution, the regulations of the United States Military, the Geneva Convention, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law. As a result, Petitioner was unable to protect or vindicate his rights under domestic and international law.

### The Authorization for the Use of Military Force

19. On September 18, 2001, then-President George W. Bush signed into law the AUMF, authorizing indefinite detention without due process of law. The law authorizes President Obama to:

> [U]se all necessary and appropriate force against those nations,

---

[1] Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval stations, U.S.-Cuba, art. III, Feb. 23, 1903, T.S. No. 418.

organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

AUMF § 2(a), Pub L. No. 107-40,115 Stat. 224, 224 (codified at 50 U.S.C. § 1541 note) (2001).

20. The AUMF is the only authority cited by Respondents in defense of their continued detention of the eighty men still held in Guantanamo Bay. The AUMF itself remains entirely without qualification, and still ostensibly applies only to those persons in some way involved in the attacks of September 11, 2001.

21. In 2011, Congress purported to "affirm" the scope of the President's detention authority in the National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-18, 125 Stat. 1298 (2011) ("NDAA"). The NDAA declares that, contrary to the express language of the AUMF, persons subject to detention under the AUMF include:

(1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

NDAA § 1021.

22. Petitioner does not fall within the ambit of the AUMF in its original form, nor as reconceived in the 2012 NDAA. He did not plan, authorize, commit, or aide the terrorist attacks that occurred on September 11, 2001, nor did he harbor such organizations or

6

persons responsible for the attacks. Petitioner never participated in hostilities against the United States or Coalition Forces, or support al-Qaeda, the Taliban or associated forces that are engaged in hostilities against the United States or its coalition partners. He has never committed a belligerent act against the United States or its coalition partners, nor has he ever supported such hostilities. Petitioner cannot therefore be lawfully detained pursuant to the AUMF.

23. The AUMF must be construed in accordance with the limitations imposed by the laws of war. Its scope has been addressed by U.S. courts, which have held that individuals may be detained pursuant to the AUMF "for the duration of the particular conflict in which they were captured." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004). This standard is found in the Geneva Conventions, and is incorporated in U.S. military regulations.

24. Article 118 of The Third Geneva Convention of 1949 requires that Respondents procure Petitioner's "release[] and repatriat[ion] without delay after the cessation of active hostilities." Geneva Convention Relative to the Treatment of Prisoners of War art. 118, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Geneva Convention III"). This obligation is an unambiguously unilateral responsibility of the United States as a detaining power. This legal obligation has been incorporated into U.S. domestic law as well, pursuant to Army Regulation 190-8, § 3-13, which requires that all prisoners be "repatriated or released at the cessation of hostilities. . . ."

25. Respondents are further required by the Geneva Conventions to "establish and execute without delay a plan of repatriation" to comply with their obligation to repatriate their prisoners. Geneva Convention III.

26. Section 1021 of the NDAA also makes clear that detention is "under the law of war" and

is authorized only until the end of hostilities.

27.    This is an especially meaningful limitation given that President Obama and other Administration national security officials have repeatedly declared that US combat operations in Afghanistan ended more than a year ago:

a.    "After more than 13 years, our combat mission in Afghanistan is over, and America's longest war has come to a responsible and honorable end." Remarks by the President at Farewell Tribute in Honor of Secretary of Defense Chuck Hagel, January 28, 2015, available at  http://www.whitehouse.gov/the-press-office /2015 /01/28/remarks-president-farewell-tribute-honor-secretary-defense-chuck-hagel (last visited July 12, 2016).

b.    "We've brought home almost 170,000 American troops, responsibly ending two long and costly ground wars and re-purposing our military strength so we can better respond to emerging threats and crises." Remarks by National Security Advisor Susan Rice on the 2015 National Security Strategy, February 6, 2015, available at http://www.whitehouse.gov/the-press-office/2015/02/06/remarks-national-security-advisor-susan-rice-2015-national-security-stra (last visited July 12, 2016).

c.    "In Afghanistan, we have ended our combat mission and transitioned to a dramatically smaller force focused on the goal of a sovereign and stable partner in Afghanistan that is not a safe haven for international terrorists." 2015 National Security Strategy, p. 9, available at http://www.whitehouse.gov/sites/default /files/docs/2015_national_security_strategy_2.pdf (last visited July 12, 2016).

28.    During the 2015 State of the Union address, the President confirmed: "Tonight, for the

8

first time since 9/11, our combat mission in Afghanistan is over." President Barack Obama, State of the Union Address (Jan. 20, 2015), available at http://www.whitehouse.gov/the-press-office/2015/01/20/remarks-president-state-union-address-january-20-2015 (last visited July 12, 2016).

29. U.S. troops remain in Afghanistan pursuant to the Security and Defense Cooperation Agreement between the United States of America and the Islamic Republic of Afghanistan, commonly known as the Bilateral Security Agreement ("BSA"), signed on September 30, 2014, by both the United States and Afghanistan. This document provides that U.S. forces that remain in Afghanistan do so in a supporting role to Afghan security forces, in order "to assist [Afghan security forces] in developing capabilities required to provide security for all Afghans." *See* BSA art. 2.2, http://mfa.gov.af/en/news/bsa; Press Release, U.S. Dep't of Defense, Obama, Military Hail Signing of U.S.-Afghan Agreement (Sept. 30, 2014), http://www.defense.gov/News-Article-View/Article/603352/obama-military-hail-signing-of-us-afghan-agreement. The United States has forces in numerous countries pursuant to security treaties; however, the deployment of forces in situations of risk does not constitute active combat operations.

30. With the end of active hostilities and the U.S.'s combat operations in Afghanistan, even if Petitioner had been appropriately detained under the AUMF, there is no longer any legal justification for Petitioner's continued detention, and he is entitled to be returned to his home country "without delay."

31. Beyond the AUMF's illegal application to Petitioner, during this wrongful exercise of authority, Respondents failed to apprise Petitioner of his rights under domestic and international law, including without limitation his right to counsel, the right to consular access, or the right to challenge the legality of his detention, as well as his right to humane treatment.

## Rights to Humane Treatment

32. Petitioner's right to humane treatment is reflected in part in the U.S. Department of the

Army's Field Manual 3-24, D-5, Counterinsurgency, (Dec. 2006), which provides that "[r]egardless of the precise legal status of those persons captured, detained, or otherwise held in custody by U.S. forces, they must receive humane treatment until properly released. They also must be provided the minimum protections of the Geneva Conventions," which include Articles 4 and 5 of Geneva Convention III, as well as Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Oct. 21, 1950, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Geneva Convention IV").

33. The Detainee Treatment Act, codified at 42 U.S.C.A. § 2000dd, provides that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment."

34. This commitment is further reflected in U.S. Army Field Manual 2-22.3 (FM34-52) Human Intelligence Collector Operations, (Sept. 2006) at M-4, which provides that "no person in the custody or under the control of the DOD, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment as defined in US law."

35. The U.S. Army Field Manual on interrogation further states that "the only interrogation approaches and techniques that are authorized for use against any detainee, regardless of status or characterization, are those authorized and listed in this Field Manual." *Id*. at vi. Interrogations are explicitly circumscribed by Geneva Conventions III and IV. *Id*. at 5-13 - 5-14. The 19 permitted techniques are set forth in Chapter 8 of FM 2-22.3. Torture is not among them.

36. On January 22, 2009, President Obama signed Executive Order 13491, which extended the regulations set forth in Field Manual FM 2-22.3 to all U.S. interrogation operations, including operations conducted by the CIA. Exec. Order No. 13491, 74 FR 4893, January 27, 2009.

37. Mr. Gul's nine years in U.S. custody have been brutal. During his captivity at a U.S.

military facility in Afghanistan, Mr. Gul's captors unlawfully blindfolded, shackled, and hung him by his arms while they were still cuffed behind his back, stripped and tortured him. He was kept alone and naked in a cell without even a bucket as a toilet. Thereafter, while flying him to Guantánamo, U.S. military personnel drugged him without consent, put a bag over his head, ear muffs over his ears, and chained him to the floor of the aircraft. His interrogators illegally abused him, denied him access to bathroom facilities, and lowered the thermostat to freezing. During interrogations, prison authorities shackled Mr. Gul for up to twelve hours without water or food in a position that allowed him to neither fully stand nor sit, preventing any sleep. That sleep deprivation torture still plagues his nights nine years later.

38.   By detaining Mr. Gul for the past nine years, the U.S. has effectively controlled his private and family life. The U.S. has prohibited him from contacting anyone in the outside world. More recently, Mr. Gul has been permitted to speak with his family via a constantly monitored, time delayed video teleconferencing call every four to six weeks. The calls last for only one hour, but they are often interrupted or end abruptly due to bad connection or U.S. censors who do not allow for families to ask detainees about their conditions at Guantánamo.

39.   Further, guards also prevent detainees from freely practicing their religion. The guards repeatedly disrupt detainees' prayers with loud noises, laughter, shouting, and refuse to inform them of prayer times and cardinal directions so detainees cannot determine the location of Mecca to align their prayer direction. Guards have also confiscated and defaced detainees' Qur'ans, preventing them from practicing their religion.

40.   The conditions of capture and detention described above clearly contravene the U.S. Government's obligations under the Geneva Conventions, Respondent Obama's Executive Order, U.S. federal law, and U.S. military regulations.

11

# V.
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (DUE PROCESS – FIFTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION)

41.    Petitioner incorporates paragraphs 1 - 40 by reference.

42.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the Fifth Amendment to the United States Constitution. Respondent Obama has ordered the prolonged, indefinite, and arbitrary detention of individuals, in violation of the Due Process Clause of the Fifth Amendment. Respondents Carter and Clarke are likewise acting in violation of the Fifth Amendment, since they act at the President's direction.

43.    On its face, the AUMF violates the Fifth Amendment.

44.    The AUMF, as applied by Respondents to Petitioner, violates Petitioner's right to due process.

### SECOND CLAIM FOR RELIEF
### (DUE PROCESS – INTERNATIONAL LAW)

45.    Petitioner incorporates paragraphs 1 - 40 by reference.

46.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate customary international law. Articles 9 and 14 of the International Covenant on Civil and Political Rights ("No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law."[2] "Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him."[3] "[E]veryone shall be entitled to a fair and public

---

[2] International Covenant on Civil and Political Rights art. 9(1), Sept. 8, 1992, 999 U.N.T.S. 171 ("ICCPR").
[3] *Id.* at Art. 9(2).

hearing by a competent, independent and impartial tribunal established by law."[4]); Article 9 of The Universal Declaration of Human Rights ("No one shall be subjected to arbitrary arrest, detention or exile."[5]); Articles XXV and XXVI of the American Declaration on the Rights and Duties of Man ("No person may be deprived of his liberty except in the cases and according to the procedures established by pre-existing law"[6]; "Every accused person is presumed to be innocent until proved guilty"[7]).

47.    Respondent Obama has ordered the prolonged, indefinite, and arbitrary detention of Petitioner, without legal process, in violation of obligations of the United States under international law.  Respondents Carter and Clarke have acted likewise in violation of international law, acting at the President's direction.

THIRD CLAIM FOR RELIEF
(DUE PROCESS – FAILURE TO COMPLY
WITH U.S. MILITARY REGULATIONS AND
INTERNATIONAL HUMANITARIAN LAW)

48.    Petitioner incorporates paragraphs 1 - 40 by reference.

49.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate Petitioner's right to humane treatment while held in U.S. custody during armed conflict, accorded to him by 42 U.S.C.A. § 2000dd, U.S. Dep't of the Army FM 2-22.3 and FM 34-52, Executive Order 13491, other U.S. military regulations, and the Geneva Conventions.

FOURTH CLAIM FOR RELIEF
(VIOLATION OF GENEVA CONVENTION & U.S. MILITARY REGULATIONS –
PETITIONER ENTITLED TO IMMEDIATE RELEASE)

50.    Petitioner incorporates paragraphs 1 - 40 by reference.

51.    Since Respondent Obama has declared that combat operations in Afghanistan are now

---

[4] *Id.* at Art. 14(1).
[5] Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, Art. 9 (1948).
[6] O.A.S. Res. XXX, reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, Art. 25, OAS/Ser.L/V/1.4 Rev. 9 (2003); 43 AJIL Supp. 133 (1949).
[7] *Id.* at Art. 26.

over, Petitioner is entitled to immediate release and repatriation pursuant to the Article 118 of Geneva Convention III.  There is no legal justification under the Law of Armed Conflict, the United States Constitution or any other source of domestic or international law that permits Petitioner's continued detention.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Petitioner's prayer for relief is as follows:

1. Order the detained Petitioner to be released from Respondents' unlawful custody;

2. Order Respondents to allow counsel to meet and confer with the detained Petitioner in private and unmonitored attorney-client conversations;

3. Order Respondents to cease all interrogations of the detained Petitioner, direct or indirect, while this litigation is pending;

4. Order and declare the AUMF unlawful as a violation of the Fifth and Fourteenth Amendments to the United States Constitution;

5. Order and declare that the detained Petitioner is being held in violation of the Fifth and Fourteenth Amendments to the United States Constitution;

6. Order and declare the AUMF unlawful as a violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;

7. Order and declare that the detained Petitioner is being held in violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;

8. Order and declare that the detained Petitioner is being held in violation of the Geneva Conventions, the regulations of the United States Armed Forces, and U.S. law on detainee treatment, and international humanitarian law, and is entitled to immediate release and repatriation;

9. To the extent Respondents contest any material factual allegations in this Petition,

14

schedule an evidentiary hearing, at which Petitioner may adduce proof in support of his allegations; and

10.  Grant such other relief as the Court may deem necessary and appropriate.

Dated: Washington, D.C.

July 15, 2016

Respectfully submitted,

**LEWIS BAACH PLLC**
Eric L. Lewis (D.C. Bar #394643)
Tara J. Plochocki (D.C. Bar #989404)
1899 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20006
(202) 833-8900
*eric.lewis@lewisbaach.com*
*tara.plochocki@lewisbaach.com*

**REPRIEVE**
Shelby Sullivan-Bennis (NY Bar # 5364278)
Clive Stafford Smith (LA Bar #14444)
P.O. Box 72054
London EC3P 3BZ
United Kingdom
011 44 207 553 8140
*shelby.sullivan-bennis@reprieve.org*
*clive.stafford.smith@reprieve.org.uk*
(646) 757-4747
(612) 872-4967 (FAX)

*Counsel for Petitioner*

15