## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ASADULLAH HAROON GUL, )
)
Petitioner, )
)
v. )
)
JOSEPH R. BIDEN, JR. et al., )
)
Respondents. )
)

Filed with the Classified
Information Security Officer
CISO
Date  10/19/2021

Case No. 16-cv-01462 (APM)

## MEMORANDUM OPINION

### I. INTRODUCTION

This case presents a question never before addressed in the legions of habeas petitions filed by Guantanamo Bay detainees: whether a member of an associated force remains detainable even after his force declares peace because his actions as a member of that associated force make him legally part of or a substantial supporter of al Qaeda.

Petitioner Asadullah Haroon Gul has been detained without charge at the Guantanamo Bay detention camp since June of 2007. He admits that, at the time of his capture, he was detainable as a member of Hezb-E-Islami Gulbuddin ("HIG"), a force that was associated with al Qaeda in the fight against coalition forces in Afghanistan. In 2016, however, HIG signed a peace agreement with the government of Afghanistan, promising to cease all hostilities and disavow its connections to terrorist organizations. By all accounts, HIG has abided by these commitments. Gul contends that HIG's peace agreement renders his indefinite detention unlawful. Respondents concede that Gul is no longer detainable for his participation in HIG. Nevertheless, they insist that he remains detainable because he was functionally a member of al Qaeda or, in the alternative, a substantial supporter of al Qaeda.

For the reasons that follow, the court grants Petitioner's habeas petition. Because HIG is at peace and Gul acted solely as a member of HIG during the Afghan conflict, the United States no longer has legal authority to detain him. He must be released.

## II. FACTUAL FINDINGS

JE 304, at 2525–26; *see also* JE 13, at 125.[1] HIG was an important militant organization in the fight against Soviet influence, but when opposing parties seized power following the Cold War, its importance in Afghan politics waned. JE 304, at 2526–30. Though its national presence dwindled, HIG still remained influential in certain milieus, particularly in refugee camps that they operated. JE 301, at 2503–04.

### A. Gul's Early Years

Asadullah Haroon Gul was raised in a HIG-run refugee camp near Peshawar, Pakistan. JE 301, at 2502. HIG was a pervasive influence in his life. He received a HIG identification card at the age of ten. *Id.* at 2504. The group provided his family with education, food, and money. *Id.* He attended schools that were run by HIG, and he later became the head of his university's HIG student organization. *Id.* at 2504, 2507. According to Gul, he has "only ever been a part of [HIG]," and to him HIG "was like a religion." *Id.* at 2502.

At an early age, Gul began to receive military training as part of his education, including at the Derunta Center in Jalalabad, Afghanistan. *See id.* at 2504. There, Gul trained alongside al Qaeda explosives expert Abu Sulayman al-Jaza'iri. *See* JE 138, at 951. Gul and Abu Sulayman

---

[1] All citations to "JE" refer to the four volumes of Joint Exhibits that the parties submitted prior to the merits hearing.

formed a lasting personal relationship. For example, when Abu Sulayman was involved in an explosives accident in 1998, Gul helped transport him to a nearby hospital. *Id.* And when Gul married, Abu Sulayman gave him 10,000 Pakistani rupees to pay for his wedding. *See* JE 134, at 926–27.

Gul also was a member of a student organization known as Sipah I-Danesh for approximately three years. JE 140, at 962. Students in Sipah I-Danesh attended religious seminars and participated in "a weeklong trip to Afghanistan for basic weapons training." *Id.* Some of its former participants "went on to become facilitators for al-Qa'ida." *Id.*

### B. 2001–2003: Gul Assists al Qaeda

Coalition forces invaded Afghanistan in October 2001, and HIG threw its support behind al Qaeda. Its leaders vowed to expel foreign fighters from Afghanistan. Hekmatyar, HIG's founder, proclaimed that "[w]e are together" with Afghan jihadists and vowed that "Hezb-e-Islami will fight our jihad until foreign troops are gone from Afghanistan and Afghans have set up an Islamic government." JE 370, at 3173 (internal quotation marks omitted).

JE 370, at 3173; *see also* JE 13, at 126

*See* JE 13, at 125–26; *see also* May 14, 2021 (PM) Hr'g Tr. at 14:9–15.[2] In late 2001, Gul was one of approximately twelve HIG members that Hekmatyar instructed to travel to Tora Bora in response to an "urgent[] request[]" for assistance from Usama bin Laden, who was facing

---

[2] All transcripts of the evidentiary hearing in this case are identified by the date of the hearing and a notation indicating whether the transcript was from that day's morning session ("AM") or afternoon session ("PM").

heavy fire there. JE 142, at 972. The mission was ultimately unsuccessful. *Id.* at 973. But once bin Laden was extracted by other fighters, Gul "served with Gulbuddin" in assisting bin Laden "to hide in the Chitral Region of Konar, [Afghanistan,] throughout 2002." JE 87, at 672.

In addition to aiding bin Laden's flight, Gul assisted al Qaeda in other ways. For example, in 2002, Gul facilitated the entry of a group of al Qaeda operatives from Pakistan into Nangarhar Province, a province in the eastern part of Afghanistan that borders Pakistan. Just prior to the U.S. invasion, Gul had joined a group of HIG fighters working under the command of Maulawi Humdullah. JE 100, at 747. An al Qaeda operative, Hajji Abdul Ahad, approached Maulawi Humdullah and Gul about bringing five al Qaeda members into Nangarhar Province and facilitating their presence once there. *Id.* Although Gul was "opposed to the plan, because it was difficult to facilitate and maintain an Arab presence in Nangarhar at that time," JE 45, at 295, he ultimately "agreed to facilitate the Arabs within Nangarhar Province," JE 100, at 747. Maulawi Humdullah and Hajji Ahad subsequently brought five al Qaeda operatives from Tirah, Pakistan, into Nangarhar, Afghanistan. *Id.* Thereafter, Gul couriered correspondence and funds for the al Qaeda operatives in Nangarhar for about one year. *Id.*

During that same time, Hajji Ahad introduced Gul to Hadi al-Iraqi, *id.*, al Qaeda's chief of military operations, JE 136, at 940. Gul developed a close relationship with Hadi al-Iraqi and undertook numerous tasks to assist him. *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JE 128, at 892 (Gul transferred medicine from Hadi al-Iraqi to an al Qaeda operative to be taken to Tirah Valley); JE 100, at 747 (Gul couriered funds and other materials for Hadi al-Iraqi); ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

███████████████ Gul likewise felt comfortable asking Hadi al-Iraqi for favors.  When Gul's friend Twahir, a member of Lashkar E-Tayyiba (another militant group), wanted to establish connections with al Qaeda members in Konar Province, Gul recommended Tawhir to Hadi al-Iraqi, and Hadi al-Iraqi wrote a letter to his subordinate "endorsing Twahir and his group" to establish the connection.  JE 136, at 940.

### C.    2004: Rift and Attempted Reconciliation with al Qaeda

Within two years of agreeing to facilitate al Qaeda fighters in Nangarhar Province, it appears that Gul's relationship with al Qaeda soured.  The record does not explain why.  What the record does show is that, in 2004, Hadi al-Iraqi instructed Gul to attempt to reconcile with an al Qaeda operative named Shakirullah, who was in charge of al Qaeda's operations in Jalalabad and Tirah.  JE 100, at 748; JE 136, at 940–41. ███████████████████████████

████████████████████████████████████████████████████████

al Qaeda was interested in re-establishing HIG's facilitation of operatives in Nangarhar.  *See* JE 100, at 748. ███████████████████████████





Also around 2004, Gul became commander of HIG operations in Nangarhar. *See* JE 88, at 678. He oversaw "up to six groups of HIG fighters operating within Nangarhar," and the groups had a mandate from the HIG Nizamia Shura (the group's military council) to "conduct operations against coalition military targets." JE 86, at 665. Gul's fighters carried out numerous attacks against coalition forces between 2005 and 2006. *See* Third Suppl. Factual Return at 36–38.

**D.      Post-2004:  Gul's Work with al Qaeda Diminishes**

Gul's connections to al Qaeda after 2004 are notably less robust than between 2001 and 2004. Gul told interrogators that he had only limited contact with al Qaeda members in the twelve to fourteen months preceding his capture in February 2007, JE 100, at 748, and therefore most of

Respondents' evidence of Gul's activities in that timeframe derives from other sources. Still, there is some evidence of Gul continuing to reach out to his connections in al Qaeda after 2004.



Additionally, there is some evidence that Gul was in contact with Abu Basir, one of the al Qaeda commanders in Jalalabad.  In 2006, Gul received a letter from Abu Basir[4] requesting Gul's "assistance in locating weapons that were supposed to have been acquired" for three al Qaeda operatives traveling to Nangarhar.  JE 100, at 748.  Gul told interrogators that he was not aware of the weapons acquisition and so did not respond to the letter.



---

[4] Gul could not recall whether this letter was from Abu Basir or Abdullah Hamas.  JE 100, at 748.

There is also evidence in the record that, just prior to his capture, Gul was poised for a promotion within HIG. Hekmatyar intended to appoint Gul as the leader of a new, selective HIG force to be known as the "Lashkari Fedayeen." JE 91, at 696. This elite force would focus on "high-level attacks throughout Afghanistan, as well as more coordinated political activism, recruitment and training." *Id.* Gul's promotion would also include his installation as "a permanent member of HIG's Nizamia Shura." *Id.*

Before Gul could lead such a force, however, he was captured ███████████████ in February 2007. ███████████████ He has remained in detention since that time and has been held at Guantanamo Bay since June 22, 2007. JE 213, at 1354 (in-processing medical evaluation for Gul's arrival at Guantanamo).

### E. HIG Reaches a Peace Agreement

The situation on the ground in Afghanistan with respect to HIG has changed since Gul was detained. On September 22, 2016, HIG entered into a formal peace agreement with the government of Afghanistan. *See* JE 305, at 2549–56. The peace agreement required HIG to, among other things, sever "any ties with terrorist groups and illegally armed organizations" and announce that "it will not support them." *Id.* at 2554. HIG appears to have kept that promise, and Respondents do not contend otherwise.

\*   \*   \*

Before proceeding any further, a word is in order about the basis for the foregoing factual findings. During the evidentiary hearing, the court received nearly 300 exhibits, most of which are classified. The evidence included ███████████████████████ and ███████████████████████

Department of Defense reports—namely, tactical interrogation reports ("TIR"), intelligence

information reports ("IIR"), and summary interrogation reports ("SIR"). JE 5 ¶¶ 6–7. ███

███████████████████████████████████████████████████

███████████████████████████████████ Department of Defense TIRs contain

"intelligence derived during interrogations of detainees," and, "if the information [in a TIR] has

intelligence value," it will be converted into an IIR, which "is the main [Department of Defense]

reporting vehicle for" human intelligence. JE 1, at 7. Finally, an SIR is a report "written by the

interrogator after an interrogation session" that includes "all the details of the interrogation session,

including[] date and time, language used, interrogation approach, and an evaluation of the detainee

regarding his deception and cooperation," as well as "all the intelligence gathered from the

session." *Id.* at 8.

In addition to intelligence documents, the court received numerous declarations from

experts in intelligence gathering and Afghanistan, as well as experts on HIG. The court also

received records specific to Gul, including medical records prepared during his detention. Finally,

Gul provided his own declaration for the court's consideration.

Gul has made numerous arguments about the weight that the court should give to

Respondents' intelligence reports. Specifically, he argues that (1) the aforementioned intelligence

reports contain hearsay and should not be accorded a presumption of regularity, Pet.'s Traverse

at 41–42; (2) the intelligence reports are not sufficiently evaluated, *id.* at 43; (3) Gul's statements

in the intelligence reports are the product of torture and should be disregarded, *id.* at 43–44; (4) the

TIR rollup, a summary of multiple TIRs produced from Gul's interrogations, contains insufficient

sourcing, *id.* at 45; and (5) the records of Gul's interrogation are not reliable because of language barriers and "[c]ultural [i]gnorance," *id.* at 49–50.[5] The court rejects these arguments.

First, Gul's arguments that the intelligence reports contain hearsay, are not sufficiently evaluated, and are not reliable because of language and cultural issues are squarely foreclosed by Circuit precedent. This court must apply a "presumption of regularity" to government-produced interrogation reports despite the fact that such reports are frequently "prepared in stressful and chaotic conditions, filtered through interpreters, subject to transcription errors, and heavily redacted for national security purposes." *Latif v. Obama*, 677 F.3d 1175, 1178–79 (D.C. Cir. 2011); *see also Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010) ("We have already held that hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable."). Gul has provided no reason that the reports of his interrogations differ fundamentally from the interrogation reports that the D.C. Circuit has held are entitled to a presumption of regularity, and the court is bound to apply that presumption here.

Second, Gul's arguments about the TIR rollup's insufficient sourcing do not require the court to discredit that document. After Gul filed his Traverse, Respondents filed a chart that matched the sections in the TIR rollup to the corresponding source documents that substantiate them. *See* JE 83. The chart allows the court to review nearly all of the source documents contained in the TIR rollup, and to the extent Respondents have not identified the source of statements in the TIR rollup, the court can evaluate the absence of substantiation on a case-by-case basis. The court is therefore not concerned that the TIR rollup lacks sufficient sourcing to be reliable.

---

[5] Gul also raises several arguments related to specific facts or sources in the record. *See, e.g.*, Pet.'s Traverse at 45 [redacted] To the extent relevant, the court addresses these arguments in the context of the facts to which they pertain. Gul also argues that the redactions in Respondents' factual returns prejudice him. *Id.* at 42. These redactions are the subject of a separate motion that is pending before the court, and the court decides that motion separately.

Third, the court does not find that Gul's statements are the product of torture.  Gul maintains that he was tortured first in Afghan custody following his capture and then at the Bagram Temporary Screening Facility where he was detained by U.S. forces.  *See* Pet.'s Traverse at 44. He has not, however, identified any evidence corroborating his claims of torture.  The evidence, if anything, is to the contrary.  For instance, Gul does not appear on the list of detainees who were subjected to CIA enhanced interrogation techniques.  S. Rep. 113-288, at 458 (2014), http:// www.intelligence.senate.gov/sites/default/files/publications/CRPT-113srpt288.pdf.        Further, Respondents have produced Gul's medical forms from when he arrived at Bagram and when he left Bagram.  *See* JE 210, at 1346 (Bagram in-take form); JE 211, at 1349 (Bagram out-processing form).  Those medical forms indicate that Gul did not present any significant injuries and did not report abuse by coalition forces after his capture.  *See* JE 210, at 1346 (checking "NO" next to prompt for "Reported Abuse by Coalition Forces After Capture" and stating "None" in response to prompt for "Injuries if Any" but noting issue with "sinuses" and "eustachian tube dysfunction"); JE 211, at 1349 (noting only a "head injury" on "side of head" that appears to be consistent with need "for ENT exam").  Gul's medical records thus do not corroborate his assertions that he was tortured.  *See al-Qurashi v. Obama*, 733 F. Supp. 2d 69, 87 (D.D.C. 2010) (noting the absence of "noteworthy" physical evidence of torture undermined claims of mistreatment).  And even if the court were to credit Gul's allegations that he was tortured, Gul has not identified any specific statements that the court should disregard because they were extracted by torture.  Particularly as Gul affirmatively relies on many of the statements he gave to interrogators to support his defense, the court cannot simply discredit Gul's statements writ large.

11

In sum, despite Gul's many arguments that Respondents' evidence should be discounted, the court accepts the record as it was presented and will accord Respondents' evidence a presumption of regularity.

## III.   PROCEDURAL HISTORY

This matter has had an extended history.  On July 15, 2016, Gul filed a petition for writ of habeas corpus.  Pet. for Writ of Habeas Corpus, ECF No. 1.  Respondents filed factual returns providing the basis for detaining Gul on (1) October 21, 2016, Resp'ts' Initial Unclassified Factual Return, ECF No. 15; (2) November 21, 2016, Notice of Classified Filing, ECF No. 17; (3) January 23, 2017, Notice of Classified Filing, ECF No. 22; and (4) March 3, 2017, Notice of Classified Filing, ECF No. 27.  Gul moved for additional discovery on May 12, 2017, Pet.'s Mot. for Disc., ECF No. 41, and the parties negotiated the scope of discovery from July 2017 through May 2019. *See* Minute Order, July 10, 2017; Minute Order, Jan. 30, 2019.  Respondents supplemented their factual return once more in July 2019.  *See* Minute Order, July 11, 2019.  Thereafter, Petitioner filed his traverse on August 19, 2019, *see* Notice of Classified Filing, ECF No. 90, and Respondents filed a response on August 14, 2020, Notice of Filing of Resp'ts' Resp. to Pet.'s Traverse, ECF No. 103.  Gul filed his final reply brief on February 16, 2021.  *See* Notice of Classified Filing, ECF No. 115.

Following the completion of briefing, the court held an eight-day evidentiary hearing on the merits of Gul's petition in May 2021.[6]  The parties submitted nearly 300 exhibits at the merits

---

[6] Just before the hearing, Gul moved for immediate release following President Joseph Biden's announcement that U.S. troops would fully withdraw from Afghanistan by September 11, 2021. *See* Mot. for an Order Requiring the Immediate Release of Asadullah Haroon Gul, ECF No. 117, Mem. of Law in Supp. of Mot. for an Order Requiring the Immediate Release of Asadullah Haroon Gul, ECF No. 117-1, at 1.  The court denied that motion without prejudice on the record, but instructed Respondents to be prepared to respond to a renewed motion when the United States' withdrawal from Afghanistan was complete.  Gul has since moved to renew his motion.  Pet.'s Req. for Renewed Consideration of Mot. for Immediate Release, ECF No. 130.  The court addresses the renewed motion by separate order.

hearing and were permitted to give both classified and unclassified opening statements and closing arguments. During the days-long evidentiary presentation, no witnesses testified, and both sides delivered extensive presentations on the documentary record before the court. The court has considered the parties' arguments and the evidence before it, and now turns on the merits of Gul's petition for writ of habeas corpus.

## IV.    LEGAL STANDARD

In the immediate aftermath of the September 11, 2001 terrorist attacks in the United States, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). Courts interpreted the 2001 Authorized Use of Military Force ("2001 AUMF") to give the Executive the authority to detain individuals who support or were a part of al Qaeda, the Taliban, or associated forces that have engaged in active hostilities against the United States. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004); *Ali v. Obama*, 736 F.3d 542, 544 (D.C. Cir. 2013).

A decade later, Congress codified that detention authority in the 2012 National Defense Authorization Act ("2012 NDAA"). In that Act, Congress provided that the 2001 AUMF "includes the authority for the Armed Forces of the United States to detain covered persons . . . pending disposition under the law of war." National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021(a), 125 Stat. 1298, 1562. A "covered person" includes "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners." *Id.* § 1021(b)(2). The United States may detain a covered person "under the law of war without trial until the end of

13

the hostilities authorized by the" 2001 AUMF. *Id.* § 1021(c)(1); *see also Al-Alwi v. Trump*, 901 F.3d 294, 297 (D.C. Cir. 2018). The government must prove that an individual is a covered person by a preponderance of the evidence. *See Awad*, 608 F.3d at 11 ("A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF.").

Two components of the United States' detention authority require further discussion. First, while the 2012 NDAA does not define when an individual can be said to be "part of" al Qaeda, the Taliban, or an associated force, the D.C. Circuit has developed a functional test to answer that question. *See Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010) ("[W]hether an individual is 'part of' al Qaeda" must be determined "on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization."). The functional test looks beyond whether an individual participates in the so-called "formal command structure" of al Qaeda and considers whether "a particular individual is sufficiently involved with the organization to be deemed part of it." *Id.* ("That an individual operates within al Qaeda's formal command structure is surely sufficient but is not necessary to show he is 'part of' the organization . . . ."); *see also Uthman v. Obama*, 637 F.3d 400, 403 (D.C. Cir. 2011) ("Indicia other than the receipt and execution of al Qaeda's orders may prove that a particular individual is sufficiently involved with the organization to be deemed part of it." (internal quotation marks omitted)). The functional test has been applied to wide-ranging behavior, and the D.C. Circuit has held that an individual is functionally a member of al Qaeda where he has, for example, traveled along a route "consistent with travel patterns of those going to Afghanistan to join the Taliban and al Qaeda," *Odah v. United States*, 611 F.3d 8, 16 (D.C. Cir. 2010); been captured in an area where al Qaeda was active while "in the company of a Taliban

fighter and two al Qaeda members," *Uthman*, 637 F.3d at 404; stayed in an al Qaeda guesthouse and attended a training camp, *Al-Madhwani v. Obama*, 642 F.3d 1071, 1075 (D.C. Cir. 2011); or joined and been accepted by a group of al Qaeda fighters, *see Awad*, 608 F.3d at 9.

Second, the 2012 NDAA likewise leaves "associated forces" undefined. But unlike the term "part of," the D.C. Circuit has not filled that definitional gap. At least one court in this Circuit has "interpret[ed] the term 'associated forces' to mean 'co-belligerents' as that term is understood under the law of war." *Hamlily v. Obama*, 616 F. Supp. 2d 63, 74 (D.D.C. 2009). Defining "associated forces" by reference to the law of war makes particular sense because the 2012 NDAA explicitly links the Executive's detention authority to "the law of war." Pub. L. No. 112-81, § 1021(a), (c)(1), 125 Stat. at 1562 (providing for detention of covered persons "pending disposition under the law of war"). Additionally, the government in this case has proffered a similar definition of an associated force: Respondents claim the "authority to detain individuals who were part of associated forces that, in analogous circumstances in a traditional international armed conflict between armed forces of opposing governments, would be detainable under principles of co-belligerency." Third Suppl. Factual Return at 4. Respondents explain that "terrorist organizations that act as agents of al Qaeda, participate with al Qaeda in acts of war against the United States or systematically provide military resources to al Qaeda in the war against the United States, are analogous to co-belligerents in a traditional war." *Id.* (alterations omitted) (quoting C. Bradley & J. Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L. Rev. 2047, 2112–13 (2005)). Previous administrations have likewise defined an associated force to have "two characteristics: (1) it is an organized, armed group that has entered the fight alongside al Qaeda, and (2) it is a cobelligerent with al Qaeda in hostilities against the United States or its coalition partners." Jeh Charles Johnson, National Security Law, Lawyers,

and Lawyering in the Obama Administration, 31 Yale L. & Pol'y Rev. 141, 146 (Fall 2012). All

of these definitions require an associated force to share more than "an abstract philosophy or even

a common purpose with al Qaeda," *Hamlily*, 616 F. Supp. 2d at 75 n.17; rather, the associated

force must have taken action to support or join al Qaeda in its hostilities against the United States,

*see, e.g.*, *Al-Bihani v. Obama*, 590 F.3d 866, 873 (D.C. Cir. 2010) (finding 55th Arab Brigade was

an associated force because it "defended the Taliban" and "harbored Al Qaeda"). The D.C. Circuit

has found that "HIG was associated with al Qaeda and the Taliban in late 2002." *Khan v. Obama*,

655 F.3d 20, 33 (D.C. Cir. 2011).

Given the deference due to "the authority of the Executive in military and national security

affairs," *Munaf v. Green*, 553 U.S. 674, 689 (2008) (internal quotation marks omitted), and the

fact that Gul has not challenged these definitions, the court accepts the definition of an associated

force as an organized, armed group that has entered the fight alongside al Qaeda and is a

cobelligerent with al Qaeda.

## V.   DISCUSSION

In the course of this litigation, Respondents abandoned their primary justification for

detention authority: Gul's membership in HIG. *See* Notice of Withdrawal of Reliance on Certain

Exhibits in the Factual Return & on Certain Legal Justification for Detention, ECF No. 75, at 1

("Respondents hereby withdraw reliance on Petitioner's membership in [HIG] as a legal

justification for his detention."). Respondents did not expressly articulate their rationale for this

abandonment, but it would appear a concession that HIG's declaration of peace with the Afghan

government, and their kept promise to disassociate with terrorist groups, disqualifies HIG as an

"associated force." *See id.* at 1 (stating that "the Court need not in this case reach the question of

whether HIG continues to be an associated force of al-Qaida"). Gul's membership in HIG

therefore cannot justify his continued detention.

16

Respondents nevertheless claim ongoing authority to detain Gul under the 2012 NDAA. They offer three bases: (1) under the functional test, Gul became "a part of" al Qaeda by virtue of his HIG-sanctioned activities in support of al Qaeda, May 28, 2021 (AM) Hr'g Tr. at 23:11–25:8; (2) Gul became "a part of" al Qaeda by exceeding the scope of his HIG-sanctioned activities to perform services for al Qaeda, Resp'ts' Resp. at 32–49; and (3) Gul "substantially supported" al Qaeda, May 28, 2021 (AM) Hr'g Tr. at 65:20–66:1.   The court addresses these three justifications in turn.[7]

### A.    Applicability of the Functional Test

Respondents' first basis for detention, the parties agree, presents a novel question. May 28, 2021 (AM) Hr'g Tr. at 26:4–7; *id.* at 75:12–17.  Respondents concede that Gul was a member of HIG, one of al Qaeda's associated forces, *e.g.*, Resp'ts' Resp. at 34, but they argue that Gul's actions as a member of HIG that benefitted al Qaeda also make him a member of al Qaeda under the Circuit's functional test. *See, e.g.*, May 28, 2021 Hr'g Tr. (AM) at 8:14–21; *id.* at 17:1–11. That is, Respondents argue that, by straightforward application of the functional test, the actions Gul took as a member of an associated force (HIG) make him equally a member of the primary force (al Qaeda). *See id.* at 23:17–25:1. The court cannot accept Respondents' position. Both the text of the 2012 NDAA and the principles motivating the associated force doctrine are at odds with simply applying the functional test to an individual whom Respondents concede was a member of an associated force.

---

[7] In addition to his arguments that Respondents lack the authority to detain him, Gul has challenged his detention on substantive due process grounds.  Because the court concludes that Respondents lack the authority to detain Gul, it does not reach Gul's substantive due process argument.

     *1.    The Text of the 2012 NDAA*

First, as a matter of statutory interpretation, the 2012 NDAA differentiates between al Qaeda and the Taliban, on the one hand, and their associated forces, on the other. *See* Pub. L. No. 112-81, § 1021(b)(2), 125 Stat. at 1562. The court's application of the statute must give that differentiation meaning. "It is . . . a 'cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 499 (D.C. Cir. 2004) (quoting *Ala. Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004)). Respondents' position violates that principle. They advocate for such an expansive interpretation of their detention authority over individuals who are "part of" al Qaeda that a member of an associated force would become part of al Qaeda simply by performing the very tasks that make two forces associated. Recall that, for a force to be associated with al Qaeda, by definition it must take action that benefits al Qaeda; Respondents explain that, to be "associated," forces must "*act as agents* of al Qaeda, *participate with* al Qaeda in acts of war against the United States or systematically *provide* military resources to al Qaeda in the war against the United States." Third Suppl. Factual Return at 4 (emphasis added) (cleaned up). If the court were to read the 2012 NDAA such that the actions of a member of an associated force could be double counted as actions that make him a member of al Qaeda, the "part of" al Qaeda prong "alone[] would do all the necessary work" in the 2012 NDAA. *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). That is, there would be no need to detain an individual under the associated force doctrine because all members of the associated force who assisted al Qaeda in any way would be detainable as part of al Qaeda. Such a construction is disfavored because it would make the statute's inclusion of

associated forces "insignificant," *Bombardier Corp.*, 380 F.3d at 499 (internal quotation marks omitted).

Respondents resist this conclusion and argue that there is not complete overlap between members of al Qaeda and members of an associated force. Instead, they suggest, there are three relevant categories—or "buckets"—of associated force members that should guide the court's inquiry here. This rubric is cut from whole cloth, but the court nevertheless considers it. In the first "bucket," Respondents say, using HIG as an example of an associated force, there are HIG "members doing HIG things for HIG purposes" exclusively—that is, members of an associated force who do not take part in the associated forces' activities on behalf of al Qaeda. May 12, 2021 Hr'g Tr. (PM) at 4:23–24. The second bucket consists of HIG "members doing HIG things for [a]l-Qaeda purposes." *Id.* at 4:24–25. And the third and final bucket is HIG "members doing al-Qaeda things for [a]l-Qaeda purposes." *Id.* at 5:1–2. According to Respondents, Gul falls into either the second or third bucket. Under Respondents' theory of the case, individuals falling into the first bucket—associated force members doing things on behalf of the associated force for the associated force's own purposes—are detainable for being part of "associated forces" but would not be detainable for being part of al Qaeda. That means, Respondents offer, that simply applying the functional test to an individual who Respondents concede is a member of an associated force would not create complete overlap between the associated force prong and the primary force prong: the associated force prong would still retain meaning because it would give the government the authority to detain members of an associated force who did not assist al Qaeda.

The court agrees that, hypothetically, Respondents might seek to detain an individual who is eligible for detention solely on the basis of his membership in an associated force. Take, for example, a HIG trainee who is captured in a training camp before ever engaging with coalition

forces.  Such a person theoretically could be detained solely for his membership in HIG, even though he never directly acts to support al Qaeda.  There is thus some daylight between associated forces and primary forces in Respondents' proposed application of the statute—though Respondents have been unable to identify a case in which this daylight was on display or was applied to a HIG or other associated force fighter.  But even if detention could in some cases be justified based exclusively on membership in an associated force, Respondents' double-counting theory in this case runs aground on the law-of-war principles of cobelligerency that Respondents claim inform the associated force doctrine.

> 2.    *Associated Force Doctrine*

Recall that Respondents have argued that an "associated force" is analogous to a cobelligerent in a traditional international war.  In an article cited by Respondents for its definition of cobelligerency, professors and former Bush administration officials Curtis Bradley and Jack Goldsmith explain the types of activities that a force undertakes to become associated with al Qaeda:

> Terrorist organizations that act as agents of al Qaeda, participate with al Qaeda in acts of war against the United States, systematically provide military resources to al Qaeda, or serve as fundamental communication links in the war against the United States, and perhaps those that systematically permit their buildings and safehouses to be used by al Qaeda in the war against the United States, are analogous to co-belligerents in a traditional war.

Bradley & Goldsmith, *supra*, at 2113; *see also* Frank M. Walsh, An Enemy by Any Other Name: The Necessity of an "Associated Forces" Standard that Accounts for al Qaeda's Changing Nature, 32 Ariz. J. Int'l & Comp. L. 349, 361 (Summer 2015) (noting duties of neutrality "require neutral states, inter alia, to refrain from participating in acts of war by the belligerent, supplying war materials to a belligerent, permitting belligerents to use its territory to move troops or munitions, or establishing wartime communication channels").  These activities that signify association

20

between forces are strikingly similar to the types of activities that the D.C. Circuit has held make someone "part of" al Qaeda. *See e.g.*, *Al-Madhwani*, 642 F.3d at 1075 (staying at an al Qaeda guesthouse or training camp); *Uthman*, 637 F.3d at 404 (being captured in areas frequented by al Qaeda or Taliban members); *Al-Adahi v. Obama*, 613 F.3d 1102, 1106 (D.C. Cir. 2010) (using travel arrangements procured by a known al Qaeda affiliate); *Awad*, 608 F.3d at 9 (being accepted by a group of al Qaeda fighters). And in fact, Respondents themselves argue that mere "*association* with members of enemy forces has factored into numerous Court of Appeals' decisions upholding the detention of Guantanamo detainees." Resp'ts' Resp. at 6 (emphasis added) (citing *Alsabri v. Obama*, 684 F.3d 1298, 1301 (D.C. Cir. 2012); *Ali*, 736 F.3d at 546; *Khairkhwa v. Obama*, 703 F.3d 547, 550 (D.C. Cir. 2012); *Al-Adahi*, 613 F.3d at 1107; *Barhoumi v. Obama*, 609 F.3d 416, 425 (D.C. Cir. 2010); *Uthman*, 637 F.3d at 404).

This overlap between actions that render an individual part of a force and actions that associate two forces is of no moment when an associated force is still engaged in active hostilities. In that case, as a practical matter, it makes no difference if the detainee is considered part of al Qaeda or part of the associated force—he is detainable. But where the detainee is a member of an associated force that has declared peace, the calculus changes. The act of declaring peace has legal significance, and a member of such a force should benefit from that legally significant act. Put differently, if a detainee joined the fight in support of an associated force, the associated force's withdrawal should presumptively constitute the detainee's withdrawal from hostilities as well. To accept Respondents' position that an associated force member's cobelligerent acts count equally toward membership in the primary force would mean that the cobelligerent would not be withdrawn from hostilities until the primary force withdraws. He would be considered part of the primary force so long as that force remained engaged in hostilities, unless he personally took

additional, affirmative steps to disassociate from the primary force. That result, as discussed below, cannot be squared with the law of war.

Respondents' approach also would lead to an anomalous result. The associated force member who is captured without ever engaging in associated force activities—a "bucket one" fighter under Respondents' rubric—would benefit from a peace agreement because he could not be considered a part of the primary force. His detention eligibility would rise or fall depending on whether the associated force is at peace. But the associated force member who actually engaged in cobelligerent activities—who did the things that make two forces associated—would not benefit from a peace agreement because, according to Respondents, his actions under the functional test also would have made him "part of" the primary force. A declaration of peace for such a fighter would make no difference. That outcome makes little sense.

Viewed in this light, Respondents' theory of the case contradicts the straightforward principle that cobelligerents do not lose their separate identity merely by joining the fight with another force. Respondents concede that their theory erodes the separate identities of cobelligerents. During the evidentiary hearing, while arguing that Gul is detainable because of his assistance to al Qaeda, Respondents argued that if a British soldier fought alongside American forces in World War II and was captured by German forces, that British soldier would remain detainable due to his assistance to American forces if Britain ceased hostilities before America did. May 28, 2021 (PM) Hr'g Tr. at 42:3–13. That is, Respondents suggested that Britain's withdrawal from active hostilities would not affect the ability of German forces to detain a British soldier who had assisted American forces. But Respondents have cited absolutely no authority to support this proposition, and law-of-war principles, in fact, state the opposite.

Pursuant to the Geneva Conventions, "[p]risoners of war shall be released and repatriated without delay after the cessation of active hostilities." Geneva Convention Relative to the Treatment of Prisoners of War art. 118(1), Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 [hereinafter Geneva Conv.]. The commentary to the Geneva Conventions makes clear that "[t]he obligation to release and repatriate prisoners of war arises as soon as active hostilities between the Detaining Power and the Power on which the prisoners depend have ceased." Int'l Comm. of the Red Cross, Commentary of 2020 on the Third Geneva Convention, art. 118, at C.2, 4452, http://ihl-databases.icrc.org/applic/ihl/ihl.nsf/Comments.xsp?action=openDocument&documentId=2E238 4E30078EF5DC125858500426E02 (last visited Oct. 6, 2021) [hereinafter Article 118 Commentary]. That is true even though "[a]ctive hostilities might . . . cease bilaterally between two belligerent Parties[] before the general close of military operations and even though active hostilities continue *with other Parties to the conflict*." *Id.* at 4454 (emphasis added). Even if a force's allies or associates continue fighting, once "the Power on which the prisoner[] depend[s]" has withdrawn from active hostilities, the duty to repatriate is triggered. *Id.* at 4452. Respondents purport to embrace such law-of-war principles as informing the scope of the associated force inquiry, *see* Third Suppl. Factual Return at 3–4 (citing Geneva Conventions), but the law of war does not condition the duty to repatriate on the detainee having refrained from providing any assistance to its still-belligerent allies. Nor does it require a detainee to affirmatively disavow those allies. And, recall, the 2012 NDAA expressly authorizes detention of "covered persons . . . pending disposition under the law of war," suggesting that these law-of-war principles are prudent considerations for interpreting the 2012 NDAA. Pub. L. No. 112-81, § 1021(a), 125 Stat. at 1562. Respondents' position that Gul's actions as a member of HIG also made him "a part of" al Qaeda is therefore firmly at odds with the Geneva Conventions and the "law of war."

<p style="text-align:center">*     *     *</p>

That leaves the court in the position of determining a framework for analyzing whether Gul, who is no longer detainable as part of an associated force, is nevertheless detainable as part of al Qaeda. No court previously has confronted such an issue. Bearing in mind the construction of the 2012 NDAA and law-of-war principles, this court believes it is appropriate to start with the presumption that a detainee who is acknowledged to be a member of an associated force and engages in traditional acts of cobelligerency does so in his capacity as a member of an associated force. To prove that an associated force fighter whose force is at peace is still detainable as part of the primary force, the government must prove by a preponderance of the evidence that the person exceeded the scope of the cobelligerency and, in so doing, effectively acted as a member of the primary force. This approach matches the construction of the detention authority codified in the 2012 NDAA: it mirrors the text by recognizing a separate detention authority for members of associated forces and members of al Qaeda and the Taliban. *See* Pub. L. No. 112-81, § 1021(b)(2), 125 Stat. at 1562. And it maintains fidelity to the principles of cobelligerency that have traditionally informed the Executive's approach to detaining members of associated forces by recognizing that allied forces maintain separate identities. *See* Article 118 Commentary at C.2, 4452. At the same time, the approach is responsive to the potentially fluid affiliations of combatants in the War on Terror in that it recognizes the potential for some members to switch affiliations midstream. *Cf.* Resp'ts' Resp. at 11 (noting the conflict in Afghanistan "has involved and continues to involve multiple, resilient, non-state armed groups, including groups with volatile histories, complex interactions, and separate agendas").

<p style="text-align:center">24</p>

**B.    Exceeding the Scope of the Cobelligerency**

The court therefore considers whether Respondents have overcome the presumption that Gul's actions were taken in his capacity as a member of HIG by showing that his assistance to al Qaeda exceeded the scope of HIG's cobelligerency. Respondents have argued that Gul exceeded the scope of HIG's cobelligerency with al Qaeda in two ways. First, they argue that Gul engaged in activity that HIG had not agreed to undertake in support of al Qaeda—that is, they say that Gul's actions went beyond the organization's limited commitment to al Qaeda. Second, they argue that Gul was not authorized by HIG to take the actions he did in support of al Qaeda—that is, they argue that Gul exceeded his prescribed role in the alliance by taking additional action to support al Qaeda. The court considers each basis in turn.

*1.    Scope of HIG's Alliance with al Qaeda*

To determine whether Gul's actions went beyond the scope of HIG's alliance with al Qaeda, the court must first ascertain the scope of HIG's cobelligerency with the primary force. Despite bearing the burden of proof on this matter, Respondents' arguments on this point have been less than a model of clarity. Their briefing does not attempt to define the scope of the cobelligerency, and their position at oral argument was evolving. At one point, Respondents argued that the type of facilitation Gul undertook in 2002 in Nangarhar Province would not have exceeded the scope of the cobelligerency between HIG and al Qaeda (although they maintained Gul was not personally authorized to undertake the facilitation by HIG leadership). *See* May 20, 2021 (AM) Hr'g Tr. at 24:10–14. But by closing argument, Respondents appeared to have abandoned that position and instead argued that HIG's cobelligerency with al Qaeda was limited

to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* May 28,

2021 (AM) Hr'g Tr. at 34:21–35:3. According to Respondents, when "al-Qaeda stopped providing

financial or military support to HIG, which [Gul] says . . . would have ended in late 2002, then HIG was no longer getting any benefit from al-Qaeda" and "all of the facilitation that Petitioner did that was . . . getting al-Qaeda people back into Afghanistan, starting in the summer of '02 and going forward, that *would not* be part of the co-belligerency between HIG and al-Qaeda." *Id.* at 30:2–12 (emphasis added).

The court is not persuaded that the affiliation between HIG and al Qaeda was so circumscribed. For starters, Respondents base their contention that the cobelligerency between HIG and al Qaeda was limited ███████████████████████████████ on just two facts in the record: (1) Gul's statement to interrogators that bin Laden stopped providing money to HIG at some point in 2002, *id.* at 28:4–29:9, 30:2–6, and (2) the *absence* of any description of HIG facilitation post-dating 2002 in declarations submitted as evidence in this case, *id.* at 40:3–41:2. As to Gul's statement, however, there is no evidence that HIG stopped assisting al Qaeda because bin Laden stopped making payments to the organization. *See* JE 89, at 684. Petitioner's statement was that *al Qaeda* stopped financially supporting HIG, not that HIG stopped supporting al Qaeda altogether. *See id.* And, while Respondents contend that the record does not contain any descriptions of HIG facilitation post-dating 2002, the record actually suggests otherwise. Respondents presented the 2008 declaration of ███████ which states that, ████████

████████████████████████████████████████████████

JE 13, at 126 (emphasis added). Even if the declarations were silent, though, Respondents bear the burden to establish the scope of the cobelligerency, and an absence of evidence is not compelling proof in establishing the boundaries of HIG's relationship with al Qaeda.

Other record evidence, though sparse on details, suggests a far more capacious alliance between HIG and al Qaeda. Public statements from Hekmatyar support that conclusion. An article

from *The Times* in the United Kingdom, on December 26, 2002, reports Hekmatyar's stating that "his fighters were aligned to defeated Taliban and al-Qaeda fugitives." JE 370, at 3173. Referring to Afghan jihadists, Hekmatyar further stated, "We are together," and "Hezb-e-Islami will fight our jihad until foreign troops are gone from Afghanistan and Afghans have set up an Islamic government." *Id.* (internal quotation marks omitted). Hekmatyar confirmed the alliance four years later. In November 2006, Hekmatyar told a different news source, "We issued clear instructions to the Mojaheddin in Hezb-e Eslami to help anyone acting against the occupations in their areas." JE 218, at 1548. He continued, "I admit to you, as head of the Hezb-e Eslami organization here, that there is not, very unfortunately, comprehensive and full coordination in all the fields and fronts with 'Al-Qa'idah' and Taleban at the leaders' level though this is present at the individuals' level in the various areas and we back it and wish it to spread and broaden." *Id.* These statements suggest that, at least at the field-commander level, HIG endorsed full coordination with al Qaeda in fighting against the U.S.-led occupation of Afghanistan. And the field-commander level is precisely where Gul operated.

Relying on the declaration that Gul provided from HIG-expert Christopher Sands, Respondents cast Hekmatyar's statements aside as "political showmanship," arguing that HIG had limited resources and thus a limited capacity to join al Qaeda. *See* May 28, 2021 Hr'g (AM) Tr. at 41:6–15. But Respondents ask the Sands declaration to bear too much weight. Sands explains that, by 2006, much of "Hekmatyar's rhetoric was political showmanship" due to resource constraints. JE 304, at 2536. This suggests that Hekmatyar was overstating HIG's ability to assist al Qaeda, but it does not refute that cooperation between HIG and al Qaeda was nonetheless ongoing and, importantly, sanctioned by HIG leadership. In fact, the Sands declaration refers to "two decades of often close cooperation between the two groups," including sheltering bin Laden

during the United States' manhunt. *Id.* And nowhere does Sands endorse Respondents' theory that cooperation between HIG and al Qaeda was limited to extricating al Qaeda fighters from Afghanistan in 2001 and 2002 and effectively ceased after bin Laden cut off financial support to HIG.

Given Respondents' failure to marshal evidence contradicting Hekmatyar's broad statements that HIG had joined the fight alongside al Qaeda through at least the time of Gul's capture, the court concludes that for purposes of Gul's detention, HIG's mission—and, by extension, Gul's—was co-extensive with al Qaeda's in fighting against the U.S.-led occupation of Afghanistan. Respondents therefore have failed to show that Gul's actions exceeded the scope of HIG's cobelligerency with al Qaeda.

### 2.    *Scope of Gul's Role in the Alliance*

Respondents' second, and more substantial, argument is that Gul exceeded the scope of the cobelligerency by providing al Qaeda with more support than he was personally authorized to provide as a HIG member. In other words, they contend, Gul did more for al Qaeda than HIG permitted him to do and, by such actions, became a part of al Qaeda. To that end, Respondents have presented a detailed list of evidence to support their position. In reviewing this evidence, the court is cognizant that it should "not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole." *Awad*, 608 F.3d at 7; *Al-Adahi*, 613 F.3d at 1106 (reversing district court that "tossed aside the government's evidence, one piece at a time"). The court therefore considers the evidence in the totality, but it is nonetheless compelled to explain the weaknesses in this evidence and why, even in combination, it is inadequate to justify Gul's continued detention.

### a.    Respondents' Evidence of HIG Members' Authority

Respondents draw on record evidence that they claim shows that Gul's actions were not authorized by HIG. May 20, 2021 (AM) Hr'g Tr. at 29:1–31:9. Some of this evidence gives shape

to Respondents' conception of the scope of individual HIG members' authority and HIG's interaction with other organizations at a broader level, and the court therefore turns to that evidence first.

According to Respondents, in order for Gul's conduct in this case to have been within his authorization from HIG, his actions must have been personally approved by Hekmatyar because Hekmatyar "always approved major decisions" for HIG. May 12, 2021 (PM) Hr'g Tr. at 26:17–22. They base this conclusion entirely on Gul's statement that "[m]ajor decisions are always finalized by Gulbuddin, but the Nizamia Shura is authorized to conduct daily business autonomously." JE 87, at 671. In the same statement, Gul told interrogators that he "maintained a consistent, written correspondence with Gulbuddin," and "he could arrange a meeting with Gulbuddin . . . if he were to suggest discussing any very important matter, such as high-level inter-organizational liaison or the opportunity to court wealthy contributors." *Id.* at 672. Tying these three statements together, Respondents argue that Gul needed to secure Hekmatyar's imprimatur for HIG's facilitation of al Qaeda members into and within Nangarhar Province—which Respondents consider a high-level inter-organizational liaison—in order for such conduct to be within Gul's authorization as a member of HIG. *See* May 20, 2021 (AM) Hr'g Tr. at 37:2–22; *see also id.* at 30:6–14. The court disagrees.

To start, Respondents' argument overlooks that Hekmatyar had already authorized the very high-level inter-organizational liaison that they cite as beyond the scope of Gul's authority: In 2002, Hekmatyar publicly stated that HIG was "together" with Afghan jihadists. JE 370, at 3173 (internal quotation marks omitted); *see also Khan*, 655 F.3d at 33 (affirming "finding that HIG was associated with al Qaeda and the Taliban in late 2002"). Thus, under Gul's articulation of HIG's leadership structure, his affiliation with al Qaeda would have been consistent with

Hekmatyar's "[m]ajor decision[]," JE 87, at 671, that HIG would support al Qaeda. Respondents have not presented any evidence that Hekmatyar required particular operations within HIG's broader organizational alliance with al Qaeda to receive his specific approval.

Nevertheless, Respondents suggest that Gul went rogue by supporting al Qaeda via means that were not specifically endorsed by Hekmatyar. They suggest that Gul was assisting al Qaeda under Hekmatyar's nose because, according to ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ JE 13, at 126. ██████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████ JE 13, at 126, and the better evidence is that Gul was not a field commander who had distanced himself from Hekmatyar but instead was, at all relevant times, deeply tied to and loyal to Hekmatyar. As Respondents note, Gul "maintained a consistent, written correspondence with Gulbuddin that . . . endured" until his capture. JE 87, at 672. Indeed, Gul traveled to visit Hekmatyar ████████████████████████ following the battle of Tora Bora and entertained a personal audience with him. JE 82, at 613. And, at the other end of the timeline, "[j]ust prior to" Gul's capture, "Hekmatyar appointed him commander of" a new force that was to consist of members "chosen based on youth, education, commitment, and loyalty to Gulbuddin, and prior evidence of effectiveness and previous accomplishments." JE 91, at 696.

As part of the appointment, Gul was to "become a permanent member of HIG's Nizamia Shura."

*Id.* Thus, while ▮▮▮ may have accurately stated ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Respondents also argue that it was common for HIG members to secretly work for other groups and interests, thereby making it plausible that Gul was also working for al Qaeda without HIG's knowledge. *See* May 20, 2021 (AM) Hr'g Tr. at 51:24–55:7. Gul told interrogators that "[t]he military wing of HIG does not share its activities with the political wing, primarily because of general suspicion that the Shura members may be working for other groups, interests and foreign intelligence agencies, primarily Pakistani, Iranian and U.S." JE 87, at 671. Respondents also rely on evidence that, after reaching a peace deal with HIG in 2016, Afghanistan did not release HIG prisoners with "active links to terrorist groups such as Al-Qaida," and they argue this proves that some HIG members affiliated with al Qaeda. JE 305, at 2546. The court accepts that Respondents have identified evidence that *some* HIG members might have worked for other organizations, but beyond that, it is frankly unclear what it is supposed to glean from these facts *about Gul*. At the time of his capture, Gul was not a member of the Shura. *See* JE 87, at 671 (suggesting "*Shura members* may be working for other groups" (emphasis added)). He is not accused of working for Pakistani, Iranian, or U.S. interests. *See id.* And, as discussed, Gul's ties to Hekmatyar were close and enduring: in 2001, he was among a select few tasked by Hekmatyar with trying to ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ JE 142, at 972, and, at the time of his capture in February 2007, he was being considered for a senior leadership position within HIG, JE 91, at 696. The record simply

does not support Respondents' theory that Gul was a double agent or secretly harbored loyalties to al Qaeda.

Relatedly, Respondents have suggested that Gul knew so many high-level al Qaeda members that he must have been a member of al Qaeda. They have identified a veritable laundry list of high-level al Qaeda operatives that Gul either knew or had information about. *See* May 13, 2021 (PM) Hr'g Tr. at 23:18–53:1. While normally "association with other al Qaeda members is itself probative of al Qaeda membership," *Uthman*, 637 F.3d at 405, Gul's association with al Qaeda members is not dispositive because Respondents have not proven that Gul would not have associated with these al Qaeda members in his capacity as a field commander of an associated force. That is, if the court were merely applying the functional test to Gul's conduct, then these relationships would be of great significance. But because Respondents must prove that Gul exceeded the scope of HIG's cobelligerency, a different evidentiary showing is required, and Respondents have not presented evidence that Gul's al Qaeda contacts were anything more than a consequence of his role as a HIG operative.

b.  Gul's Specific Conduct

Respondents have also argued that the specific facilitation that Gul undertook for al Qaeda was beyond the scope of his membership in HIG. There are essentially three timeframes in which Respondents contend Gul was improperly supporting al Qaeda: (1) the 2002 facilitation of al Qaeda operatives in Nangarhar Province, (2) ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌ and (3) his reported affiliation with al Qaeda operatives in 2006. The court takes each in turn.

i.  2002 Facilitation

Respondents' first argument that Gul exceeded the scope of his authority as a member of HIG concerns his role in a group of HIG members who facilitated for al Qaeda in Nangarhar

Province in 2002. Gul began working with HIG members who were led by Maulawi Humdullah, "the HIG commander responsible for Nangarhar Province" shortly before the U.S. invasion of Afghanistan. JE 100, at 747. Maulawi Humdullah associated with al Qaeda member Hajji Abdul Ahad, who approached Maulawi Humdullah's unit "about facilitating Arabs associated with Mohammad Rahim," another al Qaeda operative, in Nangarhar Province. *Id.* Maulawi Humdullah, Hajji Ahad, and Gul agreed that Maulawi Humdullah's HIG unit would facilitate al Qaeda operatives, and their unit subsequently moved four Arabs and one Tajik into Nangarhar Province. *Id.* Thereafter, HIG members in Maulawi Humdullah's unit, including Gul, couriered for the al Qaeda operatives. *Id.* Through this facilitation, Gul formed a relationship with high-level al Qaeda operative Hadi al-Iraqi. *Id.*

Respondents argue that, despite HIG's proclaimed alliance with al Qaeda, Gul's participation in this facilitation exceeded the scope of his authorization from HIG. They argue that the facilitation was not "official" because Gul told interrogators that he was "unsure to what extent Gulbuddin Hekmatyar was aware of this Arab facilitation by HIG members in Nangarhar." JE 100, at 747. Further, Gul said that he believed "that HIG facilitated the Arabs and Tajik in Nangarhar Province *unofficially* at the direction of Maulawi Humdullah and Hajji Abdul Ahad." *Id.* (emphasis added). To give some color to what the word "unofficial[]" might mean in this context, Respondents point to another of Gul's statements: after telling interrogators that there was "virtually no cooperation between the" Taliban and HIG, Gul explained that "through his control of HIG operations in Nangarhar," he "established some *unofficial* liaison with [Taliban] forces there, under Anwar Al-Haq Mujahed." JE 89, at 684 (emphasis added). Thus, Respondents argue, "the words 'unofficial liaison' refer to a relationship that was neither in HIG's interests, nor undertaken in Petitioner's capacity as an HIG commander," and the same definition of "unofficial"

should apply to Gul's facilitation of al Qaeda in Nangarhar. May 12, 2021 (PM) Hr'g Tr. at 33:6–13.

There are two primary flaws with this logic. To begin, Respondents' proposed definition of "unofficial" is simply not supported by the interrogation report on which they rely. While the report does refer to Gul's "unofficial liaison" with the Taliban, it simultaneously makes clear that Hekmatyar was aware of Gul's association with the Taliban. Gul's contact in the Taliban was Anwar Al-Haq Mujahed, and when Mujahed's father died, "Gulbuddin sent at least two letters to [him], offering his condolences to him on the death of his father." JE 89, at 684. Critically, *Gul* "delivered the letters personally" to Mujahed's second in command and cousin. *Id.* Whatever "unofficial" means to Gul, it strains credulity to believe that it means contrary to HIG's interests if Hekmatyar, the leader of HIG, was not only aware of Gul's liaison with a Taliban commander but took advantage of that liaison to send a personal letter. Respondents' example therefore suggests that by referring to the "unofficial" liaison between HIG and al Qaeda in Nangarhar, Gul did not mean that the operation was illicit and covert.

Next, Respondents' theory that Gul's actions were not authorized because the facilitation was unofficial and that Hekmatyar was not fully apprised of the cooperation occurring in Nangarhar is hindered by the fact that Gul entered the facilitation—which, of course, occurred not long after Hekmatyar declared an alliance between HIG and al Qaeda—upon the order of his HIG commander, Maulawi Humdullah. *See* JE 100, at 747 (noting "Maulawi Humdullah was the HIG commander responsible for Nangarhar Province"); JE 93, at 708 (noting Maulawi Humdullah was "a friend and HIG associate, as well as then-leader of the detainee's student group"). The entire facilitation was conducted under HIG auspices: the facilitation in Nangarhar arose from Maulawi Humdullah's relationship with Hajji Ahad, Maulawi Humdullah participated in the relocation of

34

al Qaeda members and couriering for al Qaeda members pursuant to the facilitation, and the facilitation took place "at the direction of Maulawi Humdullah and Hajji Abdul Ahad." JE 100, at 747. Gul was thus acting pursuant to orders from a HIG commander who was directing a facilitation for al Qaeda, an organization with which HIG's leader had publicly declared an alliance. Given these facts, the weight of the evidence simply does not support Respondents' contention that this conduct was beyond Gul's authority within HIG.

Respondents have one more rebuttal on this point: they argue that Maulawi Humdullah himself did not have the authority to carry out the 2002 facilitation in Nangarhar. May 12, 2021 (PM) Hr'g Tr. at 28:12–25 ("Maulawi Humdullah, back in 2002 when he held the very same position, would not have had authority to make decisions for HI[G]."). But again their evidentiary support for this position is less than sturdy. In his prepared declaration, Gul said that, when he was commander of HIG in Nangarhar in 2004, he was approached by al Qaeda about setting up a facilitation between al Qaeda and HIG but "did not have the authority to make decisions for HI[G]." JE 301, at 2508. Because Maulawi Humdullah had been in that same position as commander of HIG in Nangarhar when he began the facilitation with al Qaeda in 2002, Respondents argue that Maulawi Humdullah must also not have had the authority to begin the 2002 facilitation. *See* May 12, 2021 (PM) Hr'g Tr. at 28:18–29:5.

While there is superficial appeal to the idea that two people who hold the same position in an organization might have similar authority, Respondents have not presented any evidence that that is true with respect to Maulawi Humdullah and Gul. And there is reason to believe that Maulawi Humdullah and Gul did not have equal stature in the HIG organization. Until his death, Maulawi Humdullah held leadership positions over Gul, suggesting Maulawi Humdullah had greater seniority and more clout in the HIG organization. For example, Maulawi Humdullah was

Gul's teacher and the leader of Gul's student organization. JE 301, at 2507; JE 93, at 708. Indeed, "Maulawi" "is an honorific Islamic religious title given to Sunni Muslim religious scholars" who have typically "completed full studies in a madrassa (Islamic school) or Darul Uloom (Islamic seminary)." Mawlawi (Islamic title), Academic Dictionaries & Encyclopedias, https://en-academic.com/dic.nsf/enwiki/2327962 (last visited Oct. 6, 2021). This honorific and Maulawi Humdullah's multiple leadership positions over Gul suggest that Maulawi Humdullah simply outranked Gul, regardless of whether they both held the same position, and Respondents have not presented any evidence that Maulawi Humdullah's superior authority would not carry with it greater authority to make decisions for the HIG organization.

Moreover, the court cannot give the near dispositive weight that Respondents do to Gul's statement that he "did not have the authority to make decisions for HI[G]." JE 301, at 2508. The statement on its face is ambiguous. As a HIG field commander, Maulawi Humdullah (and later Gul) surely had the authority to direct his own men, and in that sense he made decisions for HIG. But could he make policy decisions for HIG as a whole? That is doubtful, and perhaps that is what Gul meant. Whatever the case may be, Gul's statement that he lacked the authority to make decisions "for HIG" is simply too feeble a ground to support the conclusion that Maulawi Humdullah exceeded the scope of his authority by moving al Qaeda fighters into Nangarhar Province and facilitating their presence there. Such actions, if anything, are entirely consistent with traditional notions of cobelligerency. *See* Walsh, *supra*, at 362 (observing that third-party groups "can aid in the conduct of an armed conflict in exactly the same way as third-party nations," such as "jointly attack[ing] targets, supply[ing] war materials to a belligerent, provid[ing] belligerents with refuge and concealment, or establish[ing] communication channels to facilitate

36

the belligerent's continued operations").  The court is not convinced that it is more likely than not

that Maulawi Humdullah was not authorized to enter the 2002 facilitation with al Qaeda.

        ii.     2004 Agreement

Respondents' next contention that Gul was part of al Qaeda rests



Gul has consistently maintained



The parties thus disagree

Respondents, on the one hand, claim

Gul, on the other hand, claims

In resolving this conflict, the court starts with the principle

is entitled to a "presumption of regularity," which requires this "court to treat the Government's record as accurate." *Latif*, 677 F.3d at 1180–81. That presumption does not, however, "compel a determination that the record establishes what it is offered to prove." *Id.* at 1181. The court must determine for itself whether the content of the record is true. *See Parhat v. Gates*, 532 F.3d 834, 847–48 (D.C. Cir. 2008). To do that, the court evaluates "internal coherence as well as its consistency with uncontested record evidence." *Barhoumi*, 609 F.3d at 428.

is in certain respects consistent with uncontested record evidence.

These are certainly not insignificant similarities. *See Barhoumi*, 609 F.3d at 429 (finding diary's "lengthy and highly detailed descriptions of real-world persons, places, and events tend to enhance the credibility of the diary as a whole"). But there is a conspicuous lack of evidence in the record corroborating the single most important—and rigorously disputed—component of

On top of that gaping hole in the evidentiary record, Respondents have not presented any evidence                                                     That is, there is no evidence

In their briefing, Respondents argue

But these allegations decidedly do not show

And in contrast to the dearth of evidence

Respondents have provided ample evidence

There are two more reasons that the court concludes



There is nothing in the record to suggest

Both parties likewise accept that



Considering

the court finds it highly unlikely based on the evidence

before it                                                                    And

Respondents have not identified any reason

The court is therefore unconvinced

the fact ███████████████ requires the court to rigorously examine ███████████

Given the other inconsistencies ████████████████████████████ the court finds that Respondents have not shown that it is more likely than not ██████████████████████████████ It is therefore not more likely than not █████████████████████████ and Gul did not exceed the scope of his membership in HIG.

iii.   2006 Affiliation with al Qaeda Operatives

Finally, Respondents attempt to show that Gul exceeded the scope of his authorization with HIG by contacting members of al Qaeda in 2006 and early 2007. *See* Resp'ts' Resp. at 46–48. Primarily, Respondents argue █████████████████████████████████ ███████████████████████████████████████████████ While Gul has raised legitimate concerns about the reliability of Respondents' sources for many of Gul's activities in 2006 and 2007, the court need not detain itself with a rigorous analysis of these sources. For even if the reporting is true, Respondents have not proven ████████████████████ ██████████████████████████ exceeded the scope of Gul's authorization from HIG to cooperate with al Qaeda. ████████████████████ ███████████████████████ Accordingly, while Gul may have █████████

43

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████████████████████████████████ such ██████ was not beyond the scope of his

authorization as a member of a force associated with al Qaeda.

<p align="center">*       *       *</p>

In conclusion, the court finds that Respondents have failed to carry their burden of showing

that Gul exceeded his role as a member of HIG on either the organizational or the individual level.

It therefore finds that Gul was not at any time "part of" al Qaeda.

### C.    Substantial Support

Finally, the court arrives at Respondents' fallback position: if Gul was not "part of"

al Qaeda, then he "substantially supported" it, thereby allowing the United States to detain him.

*See* Resp'ts' Resp. at 22; *see also* May 10, 2021 (PM) Hr'g Tr. at 6:3–5 (characterizing Gul's

"substantial support to al-Qaeda" as a "second alternative basis for" detention).  Gul parries this

contention with a legal argument.  He maintains that detention under the "substantial support"

prong of the 2012 NDAA is reserved for a "narrow category" of individuals who are "civilians

authorized to accompany [a]rmed [f]orces," May 10, 2021 (PM) Hr'g Tr. at 41:9–12, and he clearly

does not fit within that "narrow category."  The court agrees with Gul.

The 2012 NDAA does not define what a person must do to "substantially support[]"

al-Qaeda." *See* Pub. L. No. 112-81, § 1021(b)(2), 125 Stat. at 1562; *cf. Al-Bihani*, 590 F.3d at 873

(noting uncertainty as to the "outer bounds" of "purposefully and materially supported" as used in

the Military Commissions Act).  In 2012, the Department of Justice laid out its interpretation of

the bounds of substantial support in a brief filed before the Second Circuit in *Hedges v. Obama*.

*See* Reply Br. at 10–11, *Hedges v. Obama*, Nos. 12-3176, 12-3644 (2d Cir. Dec. 20, 2012)

[hereinafter *Hedges* Br.].  The Department of Justice in *Hedges* turned to law-of-war treaties that

"set forth categories of persons who may be detained as prisoners of war, including . . . a narrow

<p align="center">44</p>

category of individuals who are *not* part of enemy forces but who may nonetheless be detained."

*Id.* It explained that:

> [t]he substantial support concept, as properly informed by the law of war, would include people whose support for al-Qaeda or the Taliban makes them analogous to those who "accompany the armed forces without actually being members thereof, such as civilian members of military aircraft crews, war correspondents, supply contractors, members of labour units or of services responsible for the welfare of the armed forces."

*Id.* at 11–12 (quoting Geneva Conv. art. 4A(4)). Thus, according to the Department of Justice's own understanding, substantial supporters are "civilian members" of crews that support armed forces—they are notably *not* members of the armed forces. *See id.* (internal quotation marks omitted) (arguing substantial supporters "accompany the armed forces *without actually being members thereof*" (emphasis added) (internal quotation marks omitted)).

The Department of Justice's position in *Hedges* is consistent with the Geneva Conventions and the commentary to the Geneva Conventions. Article 4 of the Geneva Convention (III) contemplates that certain "[p]ersons who accompany the armed forces without actually being members thereof" may be treated as prisoners of war. Geneva Conv. art. 4A(4). The commentary to the Geneva Conventions emphasizes that individuals detained for their support of an armed force are civilians. *See* Int'l Comm. of the Red Cross, Commentary of 2020 to Geneva Conventions, Article 4, at H.1, http://ihl-databases.icrc.org/applic/ihl/ihl.nsf/Comment.xsp?action =OpenDocument&documentId=1796813618ABDA06C12585850057AB95 (last visited Oct. 6, 2021) (providing information regarding "[c]ivilian prisoners of war" and noting such civilians' "proximity to the armed forces increases the risk of their being interned with combatants"). Such civilians include persons who perform "services such as laundry, transportation, food and waste removal" and contractors who are involved in "the development, maintenance and operation of technologically advanced equipment of vehicles." *Id.* at H.2(a). Thus, under international law,

the category of detainees that the Department of Justice has said is analogous to substantial supporters under the 2012 NDAA is exclusively reserved for civilians who assist military forces.

Courts in the D.C. Circuit, at least factually, have relied on the "substantial support" prong of the 2012 NDAA as legal justification to detain only civilians. In *Al-Bihani*, the D.C. Circuit concluded that the petitioner was properly subject to detention under the support prong of a similar statute because "[h]e worked as the brigade's cook and carried a brigade-issued weapon." 590 F.3d at 869, 873 ("Even assuming . . . that [Al-Bihani] was a civilian 'contractor' rendering services, those services render Al-Bihani detainable under the 'purposefully and materially supported' language" of the Military Commissions Act (citation omitted)).[10]  Judge Friedman in *Paracha v. Trump* applied the substantial support prong to "a successful Pakistani businessman" who "provided financial and other support to members of the Taliban and Al-Qaeda." 453 F. Supp. 3d 168, 171, 178–79 (D.D.C. 2020) ("The Court has determined that it need not interpret the scope of the detention authority conferred by the 'part of' prong of the NDAA because the Court concludes that Mr. Paracha *has* rendered substantial support to Al-Qaeda and the Taliban."), *appeal filed*, No. 20-5039 (D.C. Cir.). Additionally, in a now vacated decision of the D.C. Circuit, the court considered the substantial support prong as applied not to a member of an enemy force but to a prominent businessman with "contact with several known and suspected affiliates of Al Qaeda and two associated terrorist organizations." *Al Hela v. Trump*, 972 F.3d 120, 127 (D.C. Cir.

---

[10] The court is cognizant that the panel in *Al-Bihani*, whose decision pre-dates the 2012 NDAA that now governs the United States' detention authority, reached a decidedly different view of the role of international law in informing the scope of the Executive's detention authority over civilian supporters. *See* 590 F.3d at 873 ("We reiterate that international law . . . do[es] not limit the President's detention power in this instance."). That holding, however, was peculiarly disavowed by a majority of active members of the Circuit in an opinion concurring in the denial of the petition for rehearing en banc. *See Al-Bihani v. Obama*, 619 F.3d 1 (2010) (mem.) (Sentelle, C.J., and Ginsburg, Henderson, Rogers, Tatel, Garland, & Griffith, JJ.) ("We decline to en banc this case to determine the role of international law-of-war principles in interpreting the AUMF because, as the various opinions issued in the case indicate, the panel's discussion of that question is not necessary to the disposition of the merits."). The D.C. Circuit has not definitively addressed the role of international law in the intervening decade since declining to rehear *Al-Bihani* en banc.

2020), *reh'g granted & opinion vacated,* Order, No. 19-5079 (D.C. Cir. Apr. 23, 2021).  To be sure, none of these cases grappled directly with the legal question of whether a member of an associated force can be detained for providing substantial support to al Qaeda.  But it is notable that Respondents have cited no case invoking that prong for an associated force member.

Faced with this body of law, Respondents have added nuance to their definition of a substantial supporter.  They now argue that a person can provide substantial support to an armed force so long as they are not a member of that armed force—meaning, perhaps conveniently here, that even if an individual is a member of a different or associated force, so long as they are not a member of the force they are accused of supporting, they are detainable as a substantial supporter. May 28, 2021 (AM) Hr'g Tr. at 65:20–66:6 ("[Y]ou cannot be an enemy force vis-à-vis the force that you are supporting . . . .").  That means, Respondents argue, that so long as Gul was not a member of al Qaeda, he could still be detainable for supporting al Qaeda, even if he was a member of HIG.

There are two problems with this interpretation.  First, it is entirely without support in the law.  Respondents have not identified any law-of-war principle, or any court case, to support this construction, nor have they identified a case where the government has even articulated this position before.  Second, Respondents' position that Gul could be a substantial supporter of al Qaeda would yet again collapse the three distinct bases for detention in the 2012 NDAA—this time collapsing the distinction between a member of an associated force and a substantial supporter of a force.  Respondents seek to use Gul's same conduct that is prototypical of an associated force—"moving around letters," "moving around funds," "ushering al-Qaeda leaders back and forth," *id.* at 72:4–10—to establish that he provided substantial support to al Qaeda.  The court

declines for a second time to endorse an interpretation of the 2012 NDAA that so muddles the three distinct bases for detention without any legal authority counseling such an approach.

Consistent with the Department of Justice's position in *Hedges* and the Geneva Conventions, the court interprets the Executive's authority to detain an individual on the basis that he substantially supported al Qaeda to be limited to "a narrow category of individuals who are *not* part of enemy forces but who may nonetheless be detained." *Hedges* Br. at 11.  Because Respondents concede that Gul was a member of HIG, an associated force of al Qaeda, he was at all relevant times a member of an enemy force, and not a civilian, and therefore cannot be detained on the basis that he substantially supported al Qaeda.

## VI.   CONCLUSION

For the foregoing reasons, the court determines that Respondents have not proven by a preponderance of the evidence that Gul remains detainable under the 2012 NDAA.  The court therefore grants Gul's Petition for Writ of Habeas Corpus, ECF No. 1.

A separate final order accompanies this Memorandum Opinion.


Date: October 18, 2021

Amit P. Mehta
United States District Court Judge